UNITED STATES DISTRICT COURT                          <u>ELECTRONIC PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
KHALID AWAN,

                              *Plaintiff*,                          MEMORANDUM
          -against-                                                <u>AND ORDER</u>
                                                                   09-CV-126 (JG)
HARLEY LAPIN, *et al.*,

                              *Defendants*.
----------------------------------------------------------------X
A P P E A R A N C E S:

          KHALID AWAN
                    #50959-054
                    United States Penitentiary-Marion
                    P.O. Box 1000
                    Marion, IL 62959
                    *Plaintiff* Pro Se

          BENTON J. CAMPBELL
                    United States Attorney for the
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, NY 11201
          By:      Scott R. Landau
                    *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

          Plaintiff Khalid Awan, currently incarcerated at the United States Penitentiary

("USP") in Marion, Illinois, brings this *pro se* action alleging violations of his constitutional

rights by various employees of the Bureau of Prisons ("BOP") and the Metropolitan Detention

Center ("MDC") in Brookyln.  Defendants filed this motion to dismiss pursuant to Fed. R. Civ.

P. 12(b)(1) and 12(b)(6), or, in the alternative, for summary judgment pursuant to Fed. R. Civ. P.

56(c).  For the reasons stated below, the motion is granted.

                                        BACKGROUND

          On October 25, 2001, FBI agents arrested Awan for credit card fraud.  He was

indicted on those charges in this district on December 4, 2001, pleaded guilty to one count of credit card fraud on March 17, 2003, and was sentenced by the Honorable Joanna Seybert to a sixty-month term of imprisonment on October 28, 2004. Awan was transferred to the MDC on January 31, 2006, and was scheduled to be released from BOP custody in March 2006.

On March 8, 2006, Awan was indicted again in this district. A superseding indictment filed on August 1 of that year charged him with two counts of conspiracy to provide material support to a terrorist organization and one count of money laundering in promotion of terrorism. Awan was tried by a jury before the Honorable Charles P. Sifton, and was found guilty of all three counts on December 20, 2006. On September 12, 2007, Judge Sifton sentenced Awan to a total of 168 months' imprisonment.

The following facts are drawn from Awan's complaint. From August 3, 2006 to March 5, 2007 and from August 16, 2007 to November 15, 2007, Awan was placed in the Special Housing Unit ("SHU") of the MDC. Throughout his confinement in the SHU, Awan was denied "all social access to telephone service . . . without explanation." Compl. 5.[1] Awan alleges that defendant B.M. Beard, the unit manager of the SHU, "and his accomplices" also refused to allow Awan to make calls to his lawyer and the Canadian Consulate. He also alleges that defendant Moses Andre Stancil, another unit manager, refused to allow him to make legal calls between August 17, 2007 and November 14, 2007. *Id.* Throughout Awan's time in the SHU, "Unit Manager [Stancil] . . . and Unit Manager [Beard] . . . failed to [*sic*] daily team visit," failed to "act in response to [administrative complaints]," failed to "take action on [Awan's] informal resolutions," and refused to "sign for acceptance of items presented for administrative action." *Id.* During the "entire term of [his] incarceration at MDC," Awan's legal mail was

---

[1] For ease of reference, I refer to the unlabeled, separately paginated statement appended to Awan's complaint form as his "complaint."

opened before he received it, in violation of BOP policy. Awan informed "SIS lieutenant [Felipe] Martinez and Lieutenant Caronilli"[2] of this infraction but received no assistance. Compl. 7. Awan is a Muslim from Pakistan, and alleges generally that the mistreatment he received at the MDC was motivated by discriminatory animus based on his religion and national origin.

On July 2006, defendant Richard Desmond, an "Intelligence Officer," searched Awan's cell, seized a copy of an Urdu magazine, copied it, and returned it to Awan. Compl. 2 The next morning, he demanded that Awan produce the magazine, and had him dig through the garbage in an unsuccessful attempt to retrieve it. On August 24, 2006, defendant D. Scott Dodrill ignored Awan's complaint regarding this incident.

Awan also alleges that did not receive regular changes of linens from August 3, 2006 through November 2006, when "Assistant Warden Andrew" finally heeded his request. Apparently during the same period, Awan developed a foot fungus but did not receive his anti-fungal ointment from the commissary or medical treatment for this condition, resulting in "painful irritation all during the extended period required to recover." Compl. 6.

On August 7, 2006, Awan began a hunger strike based on the defendants' failure to treat his injured shoulder and to provide photocopies and reading glasses to perform his legal work. Defendant Michael Drake, a lieutenant at the MDC, falsely stated in a report that Awan refused to eat because he wanted to see the warden or the assistant warden. Compl. 5.

On September 7, 2006, Awan gave a legal document to defendant Kettisha Mason-Walker, a librarian at the MDC, and asked her to copy it and return the copy and the original to him. Mason-Walker later informed Awan in writing that she had sent the document to "SIS Lieutenant Martinez," who told Awan that he had sent the document to an Assistant

---

[2] Lieutenant Caronilli is not named as a defendant in this action.

United States Attorney.  Compl. 6.  Martinez did not respond to three administrative complaints

Awan sent him.  Awan alleges that this disclosure prejudiced a motion he filed for relief from

selective prosecution.  Compl. 6.

On August 25, 2006, defendant Oscar Fortunato[3] entered Awan's cell in the SHU,

stated that he had heard that Awan was "here for terrorism," and asked Awan to tell him about

his case.  Compl. 3.  Awan said he was in for money laundering, whereupon Fortunato said

"you're lying," and left Awan's cell.  *Id.*  Awan also alleges that Fortunato repeatedly called him

a "terrorist."  *Id.*

On September 29, 2006, "CO (defendant) E. Riveria" took Awan to a "cage" to

meet with his lawyer, falsely suggesting that Awan's lawyer was waiting there to meet him, and

apparently entered his cell during Awan's absence.  Riveria is not named as a defendant in this

action.  Awan also alleges that Warden Paul M. Laird declined to respond to his complaints

regarding Riveria's conduct and the incident with Officer Desmond, and that his "bad-faith

delays" resulted in the denial of Awan's administrative appeal regarding those actions as

untimely.  Compl. 3.

On January 15, 2007, a corrections officer nicknamed "Macho" took Awan out

for recreation, and left him in the dark and the rain for at least an hour.  He complained to

Lieutenant Drake, who said "It's not bad" and took no action.  Compl. 4.  On August 17, 2007,

corrections officers Jose Caberelo and Ramirez took Awan to the recreation cage.  It began to

rain, and Awan asked to be taken in.  The officers did nothing, and Awan spent two hours in the

rain "without any proper[] clothing or footwear."  Compl. 3.  He contracted "a flu and sickness"

shortly thereafter.  *Id.*

---

[3]        Awan refers to this defendant as "Furtunato."  Compl. 3.

During an unspecified period, Awan was held for over five weeks in a cell with a leaking ceiling. He complained in writing to Lieutenant Drake, who conceded that a change of cell was warranted and ordered the move.

In January of 2007, defendant Schoenfelder, an "MDC Captain," kicked the door of Awan's cell and told him not to cover his face with a blanket. Compl. 4. Awan protested that he was unable to stay warm, and Schoenfelder responded that he did not care.

On February 27, 2007, following an attorney visit, Awan was strip-searched "without legitimate security reasons." Compl. 3. A Hispanic inmate who came out of the same visiting room was not searched.

Between March 6, 2007 and August 15, 2007, while Awan was housed at the Nassau County Jail, MDC personnel allowed his legal papers to "get exposed to water," which "destroyed" them. Compl. 7. He received an "Inmate Personal Property Form showing that the property had been destroyed from SHU CO Monrae" but apparently did not receive a signed copy of this form.

From September 13, 2007 to October 12, 2007, during the month of Ramadan, Awan alleges that defendant James McDevitt, the MDC Chaplain, and defendant Loren Van Galder, the Assistant Chaplain, improperly served him two dinner meals instead of a lunch meal and a dinner meal in the evenings. Compl. 7.

On October 4, 2007, Awan did not receive his order from the commissary. He complained to the Lieutenant and Awan received his order "after the second day." Compl. 6. He alleges that this failure was "a deliberate harassment, and [an] attempt to block me from receiving the postage stamps that would allow [him] to process [his] legal process." *Id.*

On October 9, 2007, defendant Corrections Officer Salvatore Auteri[4] "mocked Awan's religious beliefs" and harassed Awan "by demanding that [he] cuff-up, and allow him to invade the cell." Compl. 4. Awan refused and "presented two [administrative complaints] to Lieutenant John seeking his intervention," but he received no response. *Id.*

On October 17, 2007, Auteri shut off the water while Awan was shaving in his cell. Awan asked "CO Morrare" to turn on the water, and Morrare did so more than a half hour later. Compl. 5.

On or about October 29, 2007, Awan was placed in cell #225, which had no light. He spoke to "the Lieutenant" and was moved to a cell with a light after three days, during which time Awan was "unable to continue legal efforts . . . and not even able to read a book or my Holy books for daily prayers." Compl. 4.

On November 15, 2007, Awan was transferred from the MDC to the Federal Transfer Center in Oklahoma. On November 30, 2007, he was transferred to the Communications Management Unit ("CMU") of USP Terre Haute. Awan claims that this transfer is part of a BOP scheme to isolate Muslim prisoners from the general federal prison population. Compl. 8.

On December 17, 2007, after being transferred to a facility in Terre Haute, Awan directed a request to Warden Cameron Lindsay that certain legal materials be forwarded to his new facility. He received no response. Compl. 7. On February 17, 2008, he requested assistance in retrieving this property from Jennifer Dannels, a staff attorney at the MDC, but received no response.

Awan alleges that he injured his shoulder while exercising with a medicine ball in 2005, and that he aggravated this injury when he slipped and his shoulder collided with a towel

---

[4]     Awan refers to this defendant as "Auterori." Compl. 4.

rack in the MDC showers in June 2006. He claims that MDC deliberately refused to treat this injury during his confinement in the SHU, and did not receive proper treatment until he was transferred to Nassau County Jail in March 2007. He also contends that he went without bifocals for approximately eleven months and that he did not receive proper psychiatric care during his confinement in the SHU.

DISCUSSION

A.      *The Applicable Legal Standards*

      1.      *Motion to Dismiss*

Motions to dismiss pursuant to Rule 12(b)(6) test the legal, not the factual, sufficiency of a complaint. *See, e.g.*, *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000) ("At the Rule 12(b)(6) stage, '[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.'" (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998))). Accordingly, I must accept the factual allegations in the complaint as true. *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

In *Iqbal*, the Supreme Court offered district courts additional guidance regarding the consideration of motions to dismiss under Rule 12(b)(6). Citing its earlier decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, the Court explained:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

129 S. Ct. at 1949 (internal citations and quotation marks omitted).

2.      *Motion for Summary Judgment*

Under Federal Rule of Civil Procedure 56(c), a moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994) ("[T]he burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." (citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975))).  A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion."  *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam), and *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989)).

Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  The nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party.  *Matsushita*, 475 U.S. at 586.  Summary judgment is proper when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case."  *Gallo*, 22 F.3d at 1223-24.

3.      *Construction of Awan's Complaint*

As the Second Circuit has frequently advised, the filings of *pro se* litigants should be construed "liberally" and read "to raise the strongest arguments they suggest." *See McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004); *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). In light of this standard, I construe Awan's complaint to raise the following claims. First, to the extent that Awan alleges that he was confined to the SHU and harassed there because of his religion and national origin, he is claiming that this treatment violated the Equal Protection Clause of the Fifth Amendment. Second, Awan alleges that the conditions of his pretrial confinement constituted punishment prior to an adjudication of guilt in violation of the Due Process Clause of the Fifth Amendment. Third, he alleges that he was subjected to administrative confinement without due process. Fourth, Awan contends that the cumulative effect of the conditions of his confinement -- his segregation in the SHU and the harassment allegedly inflicted on him there -- constituted cruel and unusual punishment in violation of the Eighth Amendment. Fifth, he claims that the inadequacies in his medical treatment constituted deliberate indifference to a serious risk to his health. Sixth, he alleges that his confinement, coupled with the restrictions on his legal calls and the confiscation and destruction of some of his legal materials, violated his First Amendment rights to access to the courts. Finally, he states that his transfer to Terre Haute was discriminatory in violation of his First and Fifth Amendment rights. As Awan concedes that I would not have jurisdiction to consider any claims under the Federal Tort Claims Act suggested by his complaint, I do not construe his complaint to raise them.

4.      *Qualified Immunity*

The defendants allege generally that qualified immunity protects them from

Awan's claims. Because qualified immunity is "an *immunity from suit* rather than the mere

defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)(emphasis in original),

qualified immunity questions should be resolved at "the earliest possible stage in litigation."

*Saucier v. Katz*, 533 U.S. 194, 201 (2001). A qualified immunity defense is established if (1) the

defendant's action did not violate clearly established law, or (2) it was objectively reasonable for

the defendant to believe that his action did not violate such law. *See, e.g.*, *Anderson v. Creighton*,

483 U.S. 635, 638-39 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982).

      In this case, the rights Awan alleges were violated, such as his right to equal

protection, due process, and freedom from cruel and unusual punishment, are obviously clearly

established. Furthermore, properly pleaded, these allegations generally require a showing that

the defendants acted with discriminatory intent or with deliberate indifference to a serious risk to

Awan's safety or health. Accordingly, to the extent that qualified immunity is at issue in this

case, it is inextricably linked to the merits of Awan's claims, and I do not address it separately.

     5.   *Exhaustion of Administrative Remedies*

      Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought

with respect to prison conditions under section 1983 of this title, or any other Federal law, by a

prisoner confined in any jail, prison, or other correctional facility until such administrative

remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has

clarified that "the PLRA's exhaustion requirement applies to all inmate suits about prison life,

whether they involve general circumstances or particular episodes, and whether they allege

excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The

exhaustion requirements also apply to a plaintiff seeking relief not available in the prison

administrative proceeding, such as monetary damages. *See Booth v. Churner*, 532 U.S. 731,

740-41 (2001).

> The exhaustion requirement, however, is not absolute:

> Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense.

*Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004) (internal citations omitted). On the issue of estoppel, the Second Circuit has held that where a plaintiff alleges "that prison officials prevented him from exhausting his administrative remedies by beating him, threatening him, denying him grievance forms and writing implements, and transferring him to another correctional facility," he has raised a plausible claim that the defendant officials should be estopped from asserting exhaustion as a defense. *Hemphill*, 380 F.3d at 688 (summarizing *Ziemba v. Wezner*, 366 F.3d 161, 162 (2d Cir. 2004)).

Awan concedes that the MDC has an administrative review process allowing an inmate to complain of unlawful conditions of confinement. This process is described in a declaration of MDC staff attorney Nicole McFarland attached to defendants' motion. Under this process, an inmate must first report his grievance to prison staff, and the staff must attempt to resolve the issue. This informal resolution is memorialized in a form referred to as a BP-8. If the inmate is dissatisfied with the staff's resolution, he files a formal grievance, called a BP-9, with the warden. The informal complaint and the investigative result must be included with the BP-9. There are also two levels of administrative appeal if an inmate's BP-9 is not resolved to his satisfaction. Defendants argue that Awan failed to exhaust many of his claims. I address the applicability of this defense only as to those of Awan's claims that are properly pleaded and not amenable to summary judgment.

B.    *Awan's Constitutional Claims*

1.    *Equal Protection Violations*

> To prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.  *See Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir.1995).  He also must show that the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not "reasonably related to [any] legitimate penological interests."  *Shaw v. Murphy*, 532 U.S. 223, 225 (2001) (internal quotation marks omitted).

*Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005)(alteration in original).

With this standard in mind, I first consider whether Awan has adequately pleaded any equal protection violations.  A number of Awan's factual allegations hint at discriminatory intent.  He states that he was treated poorly even though he had never had any disciplinary problems.  Compl. 1.  The magazine that was the subject of his complaint regarding Officer Desmond was an "Urdu weekly magazine of ethnic origin."  Compl. 2.  Officer Auteri explicitly criticized Awan's religious beliefs.  Compl. 4.  MDC staff was generally unresponsive to plaintiff's informal complaints, and some corrections officers on duty in the SHU told Awan that "no other inmates are being treated this way."  Compl. 7.  Awan repeatedly received two dinner meals during Ramadan instead of a dinner meal and a lunch meal.  Compl. 7.  After his indictment on material support charges, Defendant Fortunato repeatedly called him a terrorist.  Compl. 3.  He was strip-searched without legitimate reason.  And in his memorandum in opposition, Awan alleges that Unit Manager B.M. Beard[5] told him he was placed in the SHU "solely because [Awan] was in fact [M]uslim and from Pakistan."[6]

---

[5]    Awan refers to this defendant as "Beards."

[6]    In light of Awan's *pro se* status and the fact that he could include this allegation in his complaint if given leave to amend, I will consider it in assessing the facial validity of Awan's complaint.

These allegations, if true, only render it plausible that Awan's transfer to the SHU and Awan's treatment by Auteri were motivated by animus based on his religious affiliation or his national origin. However, to the extent Awan alleges that his right to equal protection was violated by any other acts or omissions alleged in the complaint, including his allegations regarding improper medical treatment, I conclude that he has failed to plausibly allege discriminatory intent, and dismiss his claims accordingly.[7]

I next consider whether the government has established that it is entitled to summary judgment on these remaining claims.[8] With regard to Awan's confinement in the SHU, the government offers a declaration from Associate Warden David Ortiz stating that Awan was placed in the SHU on August 3, 2006 pending the outcome of an investigation into allegations that Awan had recruited inmates at another institution and used institution telephones to communicate with known terrorists. Ortiz Decl. ¶ 5. Ortiz also states that Awan was kept in the SHU following his return to the MDC on August 16, 2007 "because MDC administrators had concerns that [Awan]'s continued presence in general population posed safety and security risks based on his past attempts to recruit other inmates into a terrorist organization, and his use of institution telephones to communicate with known terrorists." *Id.* at ¶ 9. Indeed, Awan was

---

[7] I am not persuaded by the government's contention that the provision of Ramadan meals alleged by Awan was not "in contravention of policy." Def. Mem. 43. The September 10, 2007 memo of Chaplain McDevitt states that Ramadan observers will not receive a "lunch meal" and will instead "be given two meals" in the evening, but does not specify the content of these meals. McDevitt Decl. Ex. 2. However, the June 12, 2006 Program Statement states that Ramadan observers will receive either "the approved certified food lunch and dinner menu" or "a combination of the lunch and dinner menu after sun down." *Id.* Ex. 1 Ch. 4 at 4. Thus, although Awan received Ramadan meals in accordance with McDevitt's memo, the practice described in that memo was arguably carried out in contravention of the BOP policy set out in the program statement. However, I do not believe that this discrepancy renders plausible the allegation that the service of Ramadan meals, or any of the other acts or omissions described in Awan's complaint, were taken with discriminatory intent.

[8] Awan was served with the requisite notice to *pro se* litigants pursuant to Local Rule 56.2 and thus was placed on notice of the defendants' alternative request for summary judgment. Indeed, the plaintiffs' opposition to the motion asserts that summary judgment is not appropriate and the "complaint is ripe for a jury trial." Pl's Reply Mem. (Entry 40), at 5.

ultimately found guilty of conspiring to provide personnel to a terrorist conspiracy, and Judge

Sifton, in rejecting Awan's post-trial motion for acquittal, found that the government had

adduced evidence from which a jury could conclude that Awan was acting in furtherance of the

conspiracy in 2003 and 2004, while he was incarcerated following his fraud conviction.  Mem.

Opinion and Order 13, *United States v. Awan*, 06-CR-154 (E.D.N.Y.  Mar. 7, 2007).  In light of

Awan's failure to support his allegations of discriminatory intent with any evidence of

discriminatory intent, I find that the government has demonstrated that there is no genuine issue

of fact with regard to the intent element of this equal protection claim.

   Defendants, who have not discerned any equal protection claims in Awan's

complaint, do not submit any evidence regarding Auteri's actions or intent.  Instead, they

contend that Awan has failed to exhaust his remedies with regard to his claims against Auteri.  I

agree.  The McFarland declaration states that "Sentry records indicate that Plaintiff has never

filed any administrative remedies challenging that defendant Auterri [*sic*] harassed and made fun

of Plaintiff" or "that defendant Auterri shut off the water in Plaintiff's cell."  ¶ 24(d), (i).

Though the plaintiff's opposition to the motion attached an avalanche of complaints he made

while in custody (he made more than 150 separate requests for administrative remedies), he has

failed to provide admissible evidence refuting the defendants' evidence that the claims were

unexhausted.   Indeed, in his opposition to the motion, Awan does not seek to refute the

defendants' factual assertion that he failed to seek administrative remedies for many of the

wrongs alleged here.  Rather, he asserts that the administrative process was not "properly

afforded" to him because some of his numerous other complaints got stalled at various levels of

the administrative process.  Pl's Reply Memo. (Entry 40), at 6.  I am unpersuaded.  Though there

are circumstances where a failure to exhaust administrative remedies may be excused,[9] Awan's

has not shown any such circumstances here.

2.    *Due Process Violations*

a.    *Pre-Trial Punishment*

"[U]nder the Due Process Clause, a detainee may not be punished prior to an

adjudication of guilt in accordance with due process of law."  *Bell v. Wolfish*, 441 U.S. 520, 535

(1979).  In determining whether Awan's pretrial confinement -- which lasted from August 3,

2006 to March 2007 -- violated due process, I must consider whether the mistreatment he alleges

---

[9]       As stated above, the Second Circuit has held that there are three ways in which a "prisoner plaintiff plausibly [can] seek[] to counter defendants' contention that the prisoner failed to exhaust."  *Hemphill*, 380 F.3d at 686; *but see McQueen v. County of Albany*, No. 08-CV-799 (DNH), 2010 WL 338081, at *7 n. 8 (N.D.N.Y. Jan. 28, 2010) (applying the *Hemphill* test but noting that the effect of the Supreme Court's decision in *Woodford v. Ngo*, 540 U.S. 81 (2006) on the *Hemphill* test is unknown).  Awan appears to allege that the first part of the *Hemphill* inquiry -- the availability of administrative remedies to the prisoner -- is relevant here.  *Id.*  Awan alleges that the process was unavailable to him because the "Defendants specifically refused to answer a complaint, thus knowing that Plaintiff would be unable to exhaust his administrative rem[e]dies."  Opp. at 6.

        The Fifth, Seventh and Eighth Circuits have "deemed administrative remedies exhausted when prison officials fail to respond to inmate grievances.  *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002) (citing *Foulk v. Charrier,* 262 F.3d 687, 698 (8th Cir. 2001); *Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001); *Powe v. Ennis,* 177 F.3d 393, 394 (5th Cir. 1999); *Underwood v. Wilson,* 151 F.3d 292, 295 (5th Cir. 1998)).  In such situations, a prisoner is practically unable to exhaust his administrative remedies because of the prison's failure to respond to the prisoner's initial complaint.  These cases concern instances in which a prison fails to take any action upon the grievance at issue in the prisoner's federal case.  In contrast, Awan alleges that the prison's past practice of failing to respond to his past grievances caused administrative remedies to be practically unavailable to him for *future* grievances.  He makes no allegations, however, that he was somehow prevented from filing an initial grievance.  In fact, the record appears to indicate that there were no impediments to Awan's filing of an initial grievance.  His ability to do so is demonstrated by the fact that he has filed at least 150 complaints with the prison since March 2005, some of which were filed during and after the allegations at issue in this case.  Because Awan was able to file an initial level grievance for each of his complaints, I find unpersuasive Awan's allegation that the administrative process was "unavailable" to him.

        Furthermore, even if such an allegation were sufficient to excuse Awan's failure to exhaust, there is no evidence to support Awan's allegations that the prison did not respond to his grievances.  Awan attaches sixteen letters he received from the prison in response to some of his grievances.  These letters show that the prison did, in fact, respond to Awan's grievances.  In some instances, the warden directly responded to Awan's allegations.  In others, the response indicated that Awan did not follow the proper administrative procedures, but noted how Awan could properly submit his grievance.  These responses demonstrate that the prison did not fail to respond to Awan's grievances, but rather that the prison required, as the law does, that Awan "*properly* [exhaust] (so that the agency addresses the issues on the merits)."  *Woodford,* 548 U.S. at 90 ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings.").  Accordingly, I find that the grievance process was available to Awan and that his failure to exhaust is not excused.

was "imposed for the purpose of punishment or whether it [was] but an incident of some other legitimate governmental purpose." *Id.* at 539.

As discussed above, Awan has failed to rebut the government's showing that his confinement in the SHU was imposed to further the facility's legitimate interest in security. Much of the other mistreatment he alleges during this period, including the confiscation of his newspaper and a legal document he sought to copy, the restrictions on his phone calls, and the searches of his cell and his mail, also strikes me as "reasonably related" to this legitimate objective as a matter of law. However, Awan also alleges that during this period, he went three months without clean linens or blankets, spent five weeks in a leaky cell even though SHU prisoners are usually rotated to new cells more frequently,[10] and was twice locked outside in a dark cage while it was raining. The government does not argue that any of these incidents were reasonably related to any legitimate objective. Thus they are, potentially, impermissibly punitive.

Defendants argue that all of Awan's claims regarding the conditions of his pre-trial confinement "are . . . subject to an Eighth Amendment analysis." Def. Mem. 51. I disagree. While the Second Circuit has held that a pre-trial detainee's complaint of improper medical treatment is analyzed using the Eighth Amendment "deliberate indifference" standard, it did so because when it comes to "the duties of a custodial official . . . to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner." *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996). Under *Weyant*, then, a pre-trial detainee has at least the same right to medical treatment as a

---

[10]     Although Awan does not specify when this incident occurred, he identifies the leaky cell as #218, the same cell he occupied when he was left in the rain by "Macho" on January 15, 2007.

convicted inmate, even though the constitutional source of that entitlement differs. Relying on *Weyant*, district courts in this circuit have also analyzed claims that custodial officials breached their duty to protect a pre-trial detainee from other inmates under an Eighth Amendment framework. *See Bouknight v. Shaw*, No. 08 Civ. 5187(PKC), 2009 WL 969932, at *3 (S.D.N.Y. Apr. 6, 2009).

However, this analogy is unavailing in the context of allegedly punitive conditions of confinement. Although pre-trial detainees and convicted inmates may have comparable rights to medical treatment and protection from other inmates, their respective rights to freedom from punishment differ dramatically: the former are protected by the due process clause from punishment generally, *see Bell*, 441 U.S. at 535, while the latter are protected only from cruel and unusual punishment. Thus, even if I credit the government's contention that these conditions did not constitute cruel and unusual punishment, it does not follow as a matter of law that they cannot constitute a due process violation.

Some of the incidents Awan complaints about constitute "a *de minimis* level of imposition with which the Constitution is not concerned." *See Bell*, 441 U.S. at 539 n. 21 (quoting *Ingraham v. Wright*, 430 U.S. 651 , 674 (1977)).[11] However, I cannot conclude as a matter of law that Awan's assertion that he was twice left in the recreational cage in the rain and that, after the second incident, he "bec[a]me very ill with the flu," Pl. Mem. in Opp. 21, cannot constitute actionable punishment.

Defendants have established that Awan failed to exhaust his administrative remedies with regards to these claims. Here as well, Awan has failed to satisfactorily refute the defendants' contention, and accordingly his claims are dismissed.

---

[11] I have little trouble concluding, for example, that the incident in which an officer kicked Awan's door and told him not to cover his face with a blanket constitutes such a *de minimis* imposition.

b.    *Placement in Administrative Segregation*

It is unclear whether plaintiff alleges that he did not receive due process with regard to his placement and continued confinement in the SHU.  Assuming that Awan had a protected liberty interest in remaining in the general population,[12] his confinement in the SHU violates the Due Process Clause of the Fifth Amendment if he was deprived of that interest "without due process of law."  *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000).  But Associate Warden David Ortiz has affirmed that the propriety of this confinement was reviewed on "weekly and monthly bases" throughout Awan's time in the SHU, and BOP records annexed to his declaration support this contention.  Ortiz Decl. ¶ 5 & Ex. 2.  This evidence establishes that Awan received the process to which he was entitled, and Awan offers no evidence to rebut it.  Accordingly, to the extent Awan's complaint alleges that he was placed in administrative confinement without due process, the defendants are entitled to summary judgment on this claim.

4.    *Eighth Amendment Violations*

a.    *Conditions of Confinement*

A claim of cruel and unusual punishment has both an objective and a subjective element: the condition or deprivation must be sufficiently serious, and the officials causing the condition must act with a sufficiently culpable state of mind.  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  "Only those deprivations denying the minimal civilized measure of life's necessities are

---

[12]    Defendants argue that with respect to both pre-trial and post-conviction administrative segregation, an inmate "has a liberty interest" in remaining in the general population "only if the deprivation . . . is atypical and significant and the state has created the liberty interest by statute or regulation."  *Sealey v. Giltner*, 116 F.3d 47, 52 (2d Cir. 1997).  Although I need not resolve this issue in order to award summary judgment to the defendants on this claim, I note that the standard defendants propose is derived from *Sandin v. Conner*, 515 U.S. 472 (1995), and the Second Circuit "has said that *Sandin* does not apply to pretrial detainees and that, accordingly, pretrial detainees need not show that an imposed restraint imposes atypical and significant hardships to state deprivation of a liberty interest protected by procedural due process. *See Benjamin v. Fraser*, 264 F.3d 175, 188-89 (2d Cir.2001)."  *Iqbal v. Hasty*, 490 F.3d 143, 163 (2d Cir. 2007), reversed on other grounds *sub nom. Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) .

sufficiently grave to form the basis of an Eighth Amendment violation," and "conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." *Id.* at 298-99 (internal quotation marks and citations omitted).

With regard to the normal rigors of confinement in the SHU, Awan's claim fails because, as discussed above, that confinement was imposed pursuant to a genuine concern for prison safety and thus not motivated by malice or reckless disregard for Awan's rights. In addition to this admittedly harsh detention, Awan alleges only that his order from the commissary was delivered two days late, that the water in his cell was shut off for over a half hour, and that he spent three days in a cell with no light. As a matter of law, these are not deprivations that denied him the minimal civilized measure of life's necessities. Accordingly, the defendant's motion for summary judgment on this claim is granted.

b.       *Deliberate Indifference to Serious Medical Conditions*

As discussed above, the custodian of either a pre-trial detainee or a sentenced inmate "may be found liable" for violating an inmate's due process or Eighth Amendment rights "if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyant*, 101 F.3d at 856. "Deliberate indifference, in this context, may be shown by evidence that the official acted with reckless disregard for the substantial risk posed by the detainee's serious medical condition." *Id.*

The evidence submitted with defendants' motion for summary judgment, if unrefuted, demonstrates that Awan's shoulder injury was not particularly severe, and that MDC personnel were responsive to his claims of shoulder pain. *See generally* Beaudoin Decl. Awan has submitted medical records demonstrating that he was, in fact, diagnosed with bursitis on

September 23, 2008 (over a year after he left the MDC),  Pl. Response Ex. 16 at 21,[13] but this evidence does not create a genuine issue as to either the severity of Awan's condition or defendants' indifference towards it.  The records he submits also demonstrate that MDC personnel took several steps in response to his complaints of shoulder pain, including (1) taking Awan, on two occasions, to an outside radiological facility to have X-rays taken of his shoulder; (2) having medical personnel within the prison examine Awan's shoulder four times; and (3) giving him pain medication.  The fact that this treatment was not as aggressive as Awan would have preferred does not rise to the level of the deliberate indifference the Eighth Amendment requires.

Awan's memorandum in opposition to defendants' motion concedes that any improper medical treatment concerning his eyeglasses, his foot fungus, and his psychiatric problems and medication do not implicate any Eighth Amendment concerns.

5.      *Access to the Courts*

"It is well established that all persons enjoy a constitutional right of access to the courts . . . ."  *Monsky v. Moraghan*, 127 F.3d 243, 246 (2d Cir. 1997).  However, to establish a violation of this right, a plaintiff must properly plead and prove that the alleged interference "hindered his efforts to pursue a legal claim."  *Lewis v. Casey*, 518 U.S. 343, 351 (1996).

To the extent Awan alleges that such measures as the restrictions on his phone calls, the screening of his legal mail, and the seizure of some of his legal documents prejudiced his ability to defend his criminal case, summary judgment for the defendants is appropriate.  Although Awan's ability to make phone calls was restricted, there is no allegation that he was unable to meet with his attorneys or that his defense suffered as a result.  To the extent that Awan

---

[13]      I refer to plaintiff's unlabeled exhibits using the numbering and pagination imposed by the court's electronic filing system.

suggests he suffered prejudice when a copy of a co-conspirator's indictment was seized and then forwarded to the Assistant United States Attorney, the prejudice he allegedly suffered -- the prosecutor being tipped off about Awan's forthcoming selective prosecution motion -- was not caused by the denial of his right to access, but by the fact that prison staff gave his legal materials to the prosecution. That is, the act that allegedly denied him access did not cause the prejudice he alleges.

Finally, as to Awan's claim regarding the destruction of his legal papers through water damage, he has failed to identify a defendant whose acts caused this destruction and failed to plead "that a nonfrivolous legal claim had been frustrated" by this destruction. *Lewis*, 518 U.S. at 353. Accordingly, this claim is dismissed.

6. *Transfer to the CMU*

Awan alleges that he was transferred from the MDC to the Communications Management Unit ("CMU") of the United States Penitentiary in Terre Haute, Indiana "as part of a discriminatory practice . . . against Muslims." Compl. 8. This allegation implicates both his First Amendment right to freedom of religious expression and his Fifth Amendment right to equal protection. As suggested above, when a plaintiff claims "invidious discrimination in contravention of the First and Fifth Amendments, [the Supreme Court's] decisions make clear that a plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009).

Even assuming that a *Bivens* action lies for this type of First Amendment violation, *see id.* at 1948 ("[W]e have not found an implied damages remedy under the Free Exercise Clause."), and that Awan has properly pleaded First and Fifth Amendment claims arising from his transfer, the defendants have adduced unrefuted evidence demonstrating that

Awan was transferred to USP Terre Haute to facilitate prison security by allowing for more comprehensive monitoring of his telephone use, written correspondence, and visits. McFarland Decl. Ex. 3. As a result, Awan has failed to raise a genuine issue of material fact on the issue of discriminatory intent, and summary judgment for defendants is appropriate on this claim.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted in its entirety. The Clerk is respectfully directed to enter judgment for the defendants and to close the case.

So ordered.

John Gleeson, U.S.D.J.

Dated: March 17, 2010
       Brooklyn, New York